IN THE UNITED STATES DISTRICT COURT FOR
THE NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| Scott Eby, | ) |
|       Plaintiff, | ) ) ) |
| vs. | ) ) |
| Illinois Department of Corrections; Wexford Health Sources, Inc; Christian Okezie; Evaristo Aguinaldo; Tina Tomaras; nurse Kara; nurse Amy; nurse Krista; nurse Lydia L.; Sergeant Bailey; and LaTonya Williams. | ) ) ) ) ) ) ) ) |
|       Defendants. | ) |

Case No. 19 C 8404

Hon. John Z. Lee

## PLAINTIFF'S FIRST AMENDED COMPLAINT

Plaintiff Scott Eby (#N-91067), through his counsel, respectfully states as follows for this First Amended Complaint:

## PARTIES, JURISDICTION, & VENUE

1. This action is brought pursuant to the Eighth and Fourteenth Amendments to the U.S. Constitution, 42 U.S.C. § 1983, the Americans with Disability Act 42 U.S.C. § 12101 et seq. (the "ADA"), and the Rehabilitation Act 29 U.S.C. § 701 et seq. (the "Rehabilitation Act").

2. Plaintiff is an individual who, at all times relevant to this lawsuit, was incarcerated at Stateville Correctional Center ("Stateville").

3. Defendant Illinois Department of Corrections ("IDOC") is a part of the State of Illinois that is subject to the requirements of the ADA. IDOC receives funding from the federal government.

4. Defendant Wexford Health Sources, Inc. ("Wexford") is a corporation contracted to provide medical services in prisons in Illinois that is subject to the requirements of the ADA. On information and belief, Wexford directly contracts with the State of Illinois through IDOC.

1

5. Defendant Dr. Christian Okezie is an individual who, at all times relevant to this lawsuit, was the medical director and a physician treating inmates at Stateville and was, on information and belief, employed by Wexford.

6. Defendant Dr. Evaristo Aguinaldo is an individual who, at all times relevant to this lawsuit, was a physician treating inmates at Stateville and was, on information and belief, employed by Wexford.

7. Defendant Tina Tomaras is a nurse who, at all times relevant to this lawsuit, worked at Stateville and on information and belief treated Plaintiff.

8. Defendant Kara is a nurse who, at all times relevant to this lawsuit, worked at Stateville and on information and belief treated Plaintiff.

9. Defendant Amy is a nurse who, at all times relevant to this lawsuit, worked at Stateville and on information and belief treated Plaintiff.

10. Defendant Krista is a nurse who, at all times relevant to this lawsuit, worked at Stateville and on information and belief treated Plaintiff.

11. Defendant Lydia L. is a nurse who, at all times relevant to this lawsuit, worked at Stateville and on information and belief treated Plaintiff.

12. Defendant Sergeant Bailey is, on information and belief, employed by IDOC as a cellhouse sergeant at Stateville.

13. Defendant LaTonya Williams is a physician assistant who, at all times relevant, worked as Stateville and on information and belief treated Plaintiff.

14. This Court has subject matter jurisdiction over this case pursuant to 28 U.S.C. § 1331 because Plaintiff's claims all arise under the Constitution and laws of the United States of America.

15. This Court has personal jurisdiction over each of the Defendants because each of them engaged in the acts constituting the basis for this lawsuit within the State of Illinois, specifically at Stateville Correctional Center.

16. This Court is the proper venue for this lawsuit pursuant to 28 U.S.C. § 1391(b)(2) because the events giving rise to Plaintiff's claims took place within the Northern District of Illinois.

## COMMON ALLEGATIONS

17. On or around December 26, 2017, Plaintiff suffered a severe left shoulder injury while exercising at Stateville.

18. Plaintiff experienced extreme pain and his mobility was directly affected by this serious medical injury. The injury prevented him from lifting his arm, using his arm fully for everyday activities, sleeping, and using his arm to climb into and out of the top of a bunk bed such as those assigned to prisoners at Stateville. As a result, Plaintiff was limited to either aggravating his injury by climbing to his assigned top bunk, or sleeping on the concrete floor of his cell.

19. Plaintiff first received medical treatment on or around December 28, 2017, from a Dr. Okezie, the medical director at Stateville, and the nurse on duty. This treatment consisted of an examination and providing Robaxin, and Motrin. At this time the Plaintiff was denied a low bunk permit despite the severe pain, swelling, and limited motion in Plaintiff's left shoulder and his expressed inability to climb to his top bunk.

20. On or around January 2, 2018, the Plaintiff was given an x-ray that was ordered by Dr. Okezie. Plaintiff was informed that he would have a follow up appointment with either Dr. Okezie or Dr. Aguinaldo. However, these follow up appointments were continuously rescheduled over the course of the next two months.

21. While anxiously waiting for his follow up appointment, Plaintiff visited the nurse's station at the health care unit multiple times to report the severe pain in this left shoulder, his need for a low bunk permit, and to check on the status of his scheduled follow up appointment. Each time the nurses, medical staff and medical technicians on duty simply informed the Plaintiff that his follow up appointments had been rescheduled.

22. Finally, on March 6, 2018, the Plaintiff was seen by the nurse on duty and Dr. Aguinaldo for a follow up appointment regarding the x-rays taken approximately two months prior. At this appointment, the Plaintiff once again reiterated the constant and extreme pain he felt in his left shoulder and the exasperating effects on his left shoulder from having to climb to the top bunk. The Plaintiff pleaded with Dr. Aguinaldo for a low bunk permit but Dr. Aguinaldo informed Plaintiff that only the medical director, Dr. Okezie could issue a low bunk permit. Dr. Aguinaldo scheduled a follow up appointment for the Plaintiff with Dr. Okezie.

23. After waiting for another three weeks, the Plaintiff visited the nurse's station to inquire about the follow up appointment with Dr. Okezie. Again the nurses, medical staff and medical technicians merely reassured the Plaintiff that his appointment was scheduled for a future date.

24. As a result, Plaintiff slept for many weeks on the floor of his cell as the injury to his left shoulder prevented him from pulling himself up to his assigned top bunk. This continued until on or around March 31, 2018, when Sergeant Bailey, the cellhouse sergeant at Stateville, ordered Plaintiff to stop sleeping on the floor even though he knew of the Plaintiff's injury and the severe pain he was experiencing. This forced the Plaintiff to further aggravate the injury to his left shoulder.

25. Four weeks later, on or around April 6, 2018, the Plaintiff had a follow up appointment, but it was not with Dr. Okezie. Instead, Plaintiff saw Physician Assistant, La Tonya Williams, to whom he again stressed the severe pain in his left shoulder, his lack of mobility, and the difficulty he had climbing up to the top bunk causing him more pain and irritation. Once again, the Plaintiff was not given a low bunk permit.

26. Finally, on April 19, 2018, almost four months after the injury to his left shoulder, Plaintiff was seen by Dr. Okezie and the nurse on duty. During this visit, Dr. Okezie examined the Plaintiff and informed him that he may have a torn rotator cuff and that his injury was significant. As a result, Dr. Okezie ordered, among other things, a new chest x-ray, a referral for a magnetic resonance imaging ("MRI"), Robaxin, Tramadol, and he told Plaintiff he would grant him a low bunk permit.

27. The next day on April 20, 2018, the Plaintiff saw Nurse Kara and asked if the low bunk permit was filled out by Dr. Okezie the previous day. Nurse Kara assured the Plaintiff that it was filled out and he should receive it in 10-14 days.

28. Following this visit with Dr. Okezie, Plaintiff received his medication as ordered, but he did not receive the low bunk permit. Every day the Plaintiff asked the multiple nurses who delivered his medication both in the morning and evening why he hadn't received his low bunk permit. The nurses, including Nurse Amy, Nurse Krista and other medical staff or medical technicians, merely responded that it normally takes ten to fourteen days to receive a low bunk permit and refused to check on the status for him.

29. The Plaintiff grew very concerned that he would not get his low bunk permit and since the pain was still severe and he continued to have difficulty on a daily basis climbing to the top bunk, Plaintiff visited the nurse's station on or around May 2, 2018. He again inquired about

the status of his low bunk permit, but the nurses, including Nurse Lydia L, simply informed him that he would receive it in the mail.

30. After that, Plaintiff continued to make multiple visits to the nurse's station at the health care unit asking about his low bunk permit but was never provided any assistance on checking the status of that permit by the multiple nurses, medical staff or medical technicians on duty.

31. Also during this time, Plaintiff wrote three letters to Dr. Okezie informing Dr. Okezie that he was experiencing severe pain in his left shoulder and due to that pain he was having extreme difficulty moving his arm and climbing in and out of his top bunk. He repeatedly requested for the low bunk permit Dr. Okezie had told him he would grant him.

32. Eventually, on or around May 25, 2018, the pain was so severe that while attempting to climb to his assigned top bunk, the strength and mobility in Plaintiffs arm gave out entirely. As a result, Plaintiff fell to the concrete floor of his cell injuring his hip, back, knee and ankle. Plaintiff was taken to the health care unit in a wheelchair and was examined by Nurse Tina Tomaras who issued him an ice permit, crutches, and Ibuprofen but did not issue him a low bunk permit even though Nurse Tina Tomaras saw Dr. Okezie's notes regarding a low bunk permit and Plaintiff informed her that Dr. Okzekie had ordered one. Plaintiff was scheduled for a follow up to be seen by a physician and sent back to his cell.

33. Due to the extensive injuries and pain the Plaintiff was in, he slept on the floor of his cell for three days before being seen at his follow up appointment by Physician Assistant LaTonya Williams and the nurse on duty. At this appointment on or around May 29, 2018, the Plaintiff was given three shots for his pain in his lower back and prescribed Tramadol. X-rays

were also ordered for his lower back and hip, and his request for a low bunk permit was submitted to Dr. Okezie.

34. The Plaintiff suffered additional serious medical injuries as a result of the fall due to not having a low bunk permit. On information and belief, tests showed that the Plaintiff suffered from a herniated disk between his L4 and L5 vertebra.

35. On or around May 30, 2018, the Plaintiff finally received his low bunk permit. However, it wasn't until on or around June 1, 2018 that the Plaintiff was moved to a different cell so that he could actually use his low bunk permit and sleep on a low bunk.

36. On or around June 14, 2018, Dr. Okezie examined Plaintiff at a follow up appointment. Dr. Okezie issued Plaintiff a low bunk permit, a double mattress order, and a low gallery permit for a six-month period.

37. On August 21, 2018, the MRI was completed and showed significant shoulder injuries.

38. Despite Plaintiff's obvious and evident need for a low bunk permit and Plaintiff's multiple requests for this low bunk permit over the course of five months, the nurses, physician assistants, Dr. Okezie and Dr. Aguinaldo took no steps to provide Plaintiff with a low bunk permit, nor did they take reasonable action to treat the Plaintiff's left shoulder injury.

39. By not granting Plaintiff a low bunk permit, this caused Plaintiff to climb nightly up to his assigned top bunk which further aggravated his already serious medical injury and exposed him to a daily substantial risk of falling.

40. Ultimately, the Plaintiff was significantly harmed by this risk when he fell as he was climbing to his assigned top bunk.

41. Not only did this lack of accommodation to the Plaintiff cause the Plaintiff to fall and sustain more injuries, but it also deprived of him of his right to sleep on his assigned bed as his only other choice was to sleep on the concrete floor.

42. During the Plaintiff's confinement at Stateville, he filed several grievances and exhausted the administrative remedies available prior to filing this action.

## **COUNT I – 42 U.S.C. § 1983 (all individual defendants)**

43. Count I is directed solely to the individual defendants.

44. Plaintiff realleges Paragraph 1 to 42 of the First Amended Complaint as fully set forth in Count I.

45. Plaintiff suffered a serious shoulder injury during December 2017. This shoulder injury was an objectively serious medical condition.

46. Following his injury, Plaintiff required a low-bunk permit; without a low-bunk permit, Plaintiff faced a substantial risk of harm due to his existing shoulder injury.

47. Each of the individual Defendants knew of Plaintiff's need for a low-bunk permit and the harm that would result if he was not granted his request for a low-bunk permit.

48. Each of the individual Defendants consciously failed to take reasonable measures to provide for treatment of Plaintiff's serious medical needs including failing to provide him with a low-bunk permit.

49. Plaintiff sustained serious injuries and damages as a result of the individual Defendants' conduct and being improperly denied a low-bunk permit including (a) sleeping on the floor of his cell to avoid climbing into a top bunk; (b) ongoing pain related to climbing into and out of a top bunk and eventually falling; and (c) injuring himself while attempting to climb into a top bunk.

Wherefore, Plaintiff respectfully prays the Court: (a) enter judgment in his favor on Count I (b) award him damages in an amount to be determined; (c) award him punitive damages; (d) award him all recoverable costs and fees, including his reasonable attorney's fees; and (e) award him such further relief as the Court deems equitable and appropriate.

## COUNT II -ADA (Wexford)

50. Count II is directed solely to Wexford.

51. Plaintiff realleges Paragraph 1 to 42 of the First Amended Complaint as fully set forth in Count II.

52. Plaintiff became a disabled individual in or about December 2017 because his shoulder injury prevented him from engaging in one or more major life activities including, but not limited to, lifting his arm, using his arm fully for everyday activities, sleeping, and using his arm to climb into and out of the top of a bunk bed such as those assigned to prisoners at Stateville.

53. Plaintiff is a qualified individual with a disability as defined by the ADA.

54. While confined at Stateville and being treated by Wexford and its employees, Plaintiff made repeated requests to be approved for a low-bunk permit.

55. Plaintiff's need for a low-bunk permit was open and obvious to Wexford.

56. Wexford intentionally, or with deliberate indifference, discriminated against Plaintiff on the basis of his disability by denying him a low-bunk permit.

57. Plaintiff sustained serious injuries and damages as a result of Wexford's discrimination including (a) sleeping on the floor of his cell to avoid climbing into a top bunk; (b) ongoing pain related to climbing into and out of a top bunk and eventually falling; and (c) injuring himself while attempting to climb into a top bunk.

Wherefore, Plaintiff respectfully prays the Court: (a) enter judgment in his favor on Count II (b) award him damages in an amount to be determined; (c) award him punitive damages; (d) award him all recoverable costs and fees, including his reasonable attorney's fees; and (e) award him such further relief as the Court deems equitable and appropriate.

## COUNT III -Rehabilitation Act (Wexford)

58. Count III is directed solely at Wexford.

59. Plaintiff realleges Paragraph 1 to 42 of the First Amended Complaint as fully set forth in Count III.

60. Plaintiff became a disabled individual in or about December 2017 because his shoulder injury prevented him from engaging in one or more major life activities including, but not limited to, lifting his arm, using his arm fully for everyday activities, sleeping, and using his arm to climb into and out of the top of a bunk bed such as those assigned to prisoners at Stateville.

61. Plaintiff is a qualified individual with a disability as defined by the Rehabilitation Act.

62. While confined at Stateville and being treated by Wexford and its employees, Plaintiff made repeated requests to be approved for a low-bunk permit.

63. Plaintiff's need for a low-bunk permit was open and obvious to Wexford.

64. Wexford intentionally, or with deliberate indifference, discriminated against Plaintiff on the basis of his disability by denying him a low-bunk permit.

65. Wexford denied Plaintiff access to a low-bunk permit.

66. Plaintiff sustained serious injuries and damages as a result of Wexford's discrimination including (a) sleeping on the floor of his cell to avoid climbing into a top bunk;

(b) ongoing pain related to climbing into and out of a top bunk and eventually falling; and (c) injuring himself while attempting to climb into a top bunk.

Wherefore, Plaintiff respectfully prays the Court: (a) enter judgment in his favor on Count III (b) award him damages in an amount to be determined; (c) award him punitive damages; (d) award him all recoverable costs and fees, including his reasonable attorney's fees; and (e) award him such further relief as the Court deems equitable and appropriate.

## COUNT IV – ADA (IDOC)

67. Count IV is directed solely to IDOC.

68. Plaintiff realleges Paragraph 1 to 42 of the First Amended Complaint as fully set forth in Count IV.

69. Plaintiff became a disabled individual in or about December 2017 because his shoulder injury prevented him from engaging in one or more major life activities including, but not limited to, lifting his arm, using his arm fully for everyday activities, sleeping, and using his arm to climb into and out of the top of a bunk bed such as those assigned to prisoners at Stateville.

70. Plaintiff is a qualified individual with a disability as defined by the ADA.

71. While confined at Stateville, Plaintiff made repeated requests to be approved for a low-bunk permit.

72. Plaintiff's need for a low-bunk permit was open and obvious to IDOC.

73. Even after Wexford's employees approved Plaintiff's requests for a low-bunk permit, IDOC refused to provide one to Plaintiff.

74. IDOC intentionally, or with deliberate indifference, discriminated against Plaintiff on the basis of his disability by denying him a low-bunk permit.

75. Plaintiff sustained serious injuries and damages as a result of IDOC discrimination including (a) sleeping on the floor of his cell to avoid climbing into a top bunk; (b) ongoing pain related to climbing into and out of a top bunk and eventually falling; and (c) injuring himself while attempting to climb into a top bunk.

Wherefore, Plaintiff respectfully prays the Court: (a) enter judgment in his favor on Count V (b) award him damages in an amount to be determined; (c) award him punitive damages; (d) award him all recoverable costs and fees, including his reasonable attorney's fees; and (e) award him such further relief as the Court deems equitable and appropriate.

## COUNT V – REHABILITATION ACT (IDOC)

76. Count V is directed solely to IDOC.

77. Plaintiff realleges Paragraph 1 to 42 of the First Amended Complaint as fully set forth in Count IV.

78. Plaintiff became a disabled individual in or about December 2017 because his shoulder injury prevented him from engaging in one or more major life activities including, but not limited to, lifting his arm, using his arm fully for everyday activities, sleeping, and using his arm to climb into and out of the top of a bunk bed such as those assigned to prisoners at Stateville.

79. Plaintiff is a qualified individual with a disability as defined by the Rehabilitation Act.

80. While confined at Stateville, Plaintiff made repeated requests to be approved for a low-bunk permit.

81. Plaintiff's need for a low-bunk permit was open and obvious to IDOC.

82. Even after Wexford's employees approved Plaintiff's requests for a low-bunk permit, IDOC refused to provide one to Plaintiff.

83. IDOC intentionally, or with deliberate indifference, discriminated against Plaintiff on the basis of his disability by denying him a low-bunk permit.

84. Plaintiff sustained serious injuries and damages as a result of IDOC discrimination including (a) sleeping on the floor of his cell to avoid climbing into a top bunk; (b) ongoing pain related to climbing into and out of a top bunk and eventually falling; and (c) injuring himself while attempting to climb into a top bunk.

Wherefore, Plaintiff respectfully prays the Court: (a) enter judgment in his favor on Count V (b) award him damages in an amount to be determined; (c) award him punitive damages; (d) award him all recoverable costs and fees, including his reasonable attorney's fees; and (e) award him such further relief as the Court deems equitable and appropriate.

Dated: April 17, 2020                    Respectfully submitted,


                                         /s/ Michael S. Shapiro
                                         Attorney for the Plaintiff Scott Eby

Michael S. Shapiro
Elizabeth Gomez
Tomlinson & Shapiro, P.C.
8501 W Higgins Rd, Ste. 420
Chicago, IL 60631
312-715-8770
mss@tomlinsonshapiro.com
ehg@tomlinsonshapiro.com