IN THE UNITED STATES DISTRICT COURT FOR
THE NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| Scott Eby, )<br>)<br>       Plaintiff, )<br>)<br>  vs. )<br>)<br>Illinois Department of Corrections; Wexford )<br>Health Sources, Inc; Christian Okezie; )<br>Evaristo Aguinaldo; Tina Tomaras; Kara )<br>Matakiewicz; Amy Bartlett; Krista Carnahan; )<br>Lidia Lewandowska; Sergeant Kenyon Bailey; )<br>LaTonya Williams, Rozel Elazegui; Wendy )<br>Dybass; Leslie Wilking; Amy Rue; Michelle )<br>Dalton; Alethea Harper; Virginia Garcia; Jerri )<br>Angeloff; Gerlad Dimailig; Dawn Cetta; Dina )<br>Page; Christine Witowski; Jennifer Henning; )<br>& Emmanuel Egbe. )<br>)<br>       Defendants. | Case No. 19 C 8404<br><br>Hon. John Z. Lee |

**PLAINTIFF'S FIRST AMENDED COMPLAINT**

Plaintiff Scott Eby (#N-91067), through his counsel, respectfully states as follows for this First Amended Complaint:

**PARTIES, JURISDICTION, & VENUE**

1. This action is brought pursuant to the Eighth and Fourteenth Amendments to the U.S. Constitution, 42 U.S.C. § 1983, the Americans with Disability Act 42 U.S.C. § 12101 et seq. (the "ADA"), and the Rehabilitation Act 29 U.S.C. § 701 et seq. (the "Rehabilitation Act").

2. Plaintiff is an individual who, at all times relevant to this lawsuit, was incarcerated at Stateville Correctional Center ("Stateville").

3. Defendant Illinois Department of Corrections ("IDOC") is a part of the State of Illinois that is subject to the requirements of the ADA. IDOC receives funding from the federal government.

1

4. Defendant Wexford Health Sources, Inc. ("Wexford") is a corporation contracted to provide medical services in prisons in Illinois that is subject to the requirements of the ADA. On information and belief, Wexford directly contracts with the State of Illinois through IDOC. On information and belief, Wexford receives funding from the federal government as part of its contract with IDOC.

5. Defendant Dr. Christian Okezie is an individual who, at all times relevant to this lawsuit, was the medical director and a physician treating inmates at Stateville and was, on information and belief, employed by Wexford.

6. Defendant Dr. Evaristo Aguinaldo is an individual who, at all times relevant to this lawsuit, was a physician treating inmates at Stateville and was, on information and belief, employed by Wexford.

7. Defendant Tina Tomaras is a nurse who, at all times relevant to this lawsuit, worked at Stateville and on information and belief treated Plaintiff.

8. Defendant Kara Matakiewicz is a nurse who, at all times relevant to this lawsuit, worked at Stateville and on information and belief treated Plaintiff.

9. Defendant Amy Bartlett is a nurse who, at all times relevant to this lawsuit, worked at Stateville and on information and belief treated Plaintiff.

10. Defendant Krista Carnahan is a nurse who, at all times relevant to this lawsuit, worked at Stateville and on information and belief treated Plaintiff.

11. Defendant Lidia Lewandowska is a nurse who, at all times relevant to this lawsuit, worked at Stateville and on information and belief treated Plaintiff.

12. Defendant Sergeant Kenyon Bailey is, on information and belief, employed by IDOC as a cellhouse sergeant at Stateville.

13. Defendant LaTonya Williams is a physician assistant who, at all times relevant, worked as Stateville and on information and belief treated Plaintiff.

14. Defendant Dr. Rozel Elazegui is an individual who, at all times relevant to this lawsuit, was the medical director and a physician treating inmates at Stateville and was, on information and belief, employed by Wexford.

15. Defendant Wendy Dybass is a nurse who, at all times relevant to this lawsuit, worked at Stateville and on information and belief treated Plaintiff.

16. Defendant Leslie Wilking is a nurse who, at all times relevant to this lawsuit, worked at Stateville and on information and belief treated Plaintiff.

17. Defendant Amy Rue is a nurse who, at all times relevant to this lawsuit, worked at Stateville and on information and belief treated Plaintiff.

18. Defendant Michelle Dalton is a nurse who, at all times relevant to this lawsuit, worked at Stateville and on information and belief treated Plaintiff.

19. Defendant Alethea Harper is a nurse who, at all times relevant to this lawsuit, worked at Stateville and on information and belief treated Plaintiff.

20. Defendant Virginia Garcia is a nurse who, at all times relevant to this lawsuit, worked at Stateville and on information and belief treated Plaintiff.

21. Defendant Jeri Angeloff is a nurse who, at all times relevant to this lawsuit, worked at Stateville and on information and belief treated Plaintiff.

22. Defendant Gerlad Dimailig is a nurse who, at all times relevant to this lawsuit, worked at Stateville and on information and belief treated Plaintiff.

23. Defendant Dawn Cetta is a nurse who, at all times relevant to this lawsuit, worked at Stateville and on information and belief treated Plaintiff.

24. Defendant Dina Page is a nurse who, at all times relevant to this lawsuit, worked at Stateville and on information and belief treated Plaintiff.

25. Defendant Christine Witkowski is a nurse who, at all times relevant to this lawsuit, worked at Stateville and on information and belief treated Plaintiff.

26. Defendant Jennifer Henning is a nurse who, at all times relevant to this lawsuit, worked at Stateville and on information and belief treated Plaintiff.

27. Defendant Emmanuel Egbe is a nurse who, at all times relevant to this lawsuit, worked at Stateville and on information and belief treated Plaintiff.

28. This Court has subject matter jurisdiction over this case pursuant to 28 U.S.C. § 1331 because Plaintiff's claims all arise under the Constitution and laws of the United States of America.

29. This Court has personal jurisdiction over each of the Defendants because each of them engaged in the acts constituting the basis for this lawsuit within the State of Illinois, specifically at Stateville Correctional Center.

30. This Court is the proper venue for this lawsuit pursuant to 28 U.S.C. § 1391(b)(2) because the events giving rise to Plaintiff's claims took place within the Northern District of Illinois.

## COMMON ALLEGATIONS

31. On or around December 26, 2017, Plaintiff suffered a severe left shoulder injury while exercising at Stateville.

32. Plaintiff experienced extreme pain and his mobility was directly affected by this serious medical injury. The injury prevented him from lifting his arm, using his arm fully for everyday activities, sleeping, and using his arm to climb into and out of the top of a bunk bed such as those assigned to prisoners at Stateville. As a result, Plaintiff was limited to either

4

aggravating his injury by climbing to his assigned top bunk, or sleeping on the concrete floor of his cell.

33. Plaintiff first received medical treatment on or around December 28, 2017, upon information and belief from either a Dr. Okezie, the medical director at Stateville, or Dr. Rozel Elazegui, and the nurses on duty, Wendy Dybass and Leslie Wilking. This treatment consisted of an examination and providing Robaxin, and Motrin. At this time the Plaintiff was denied a low bunk permit despite the severe pain, swelling, and limited motion in Plaintiff's left shoulder and his expressed inability to climb to his top bunk interfering with his ability to sleep.

34. On or around January 2, 2018, the Plaintiff was given an x-ray that was ordered by either Dr. Okezie or Dr. Elazegui. Plaintiff was informed that he would have a follow up appointment with either Dr. Elazegui, Dr. Okezie, or Dr. Aguinaldo. However, these follow up appointments were continuously rescheduled over the course of the next two months.

35. While anxiously waiting for his follow up appointment, Plaintiff visited the nurse's station at the health care unit multiple times to report the severe pain in this left shoulder interfering with his ability to sleep, his need for a low bunk permit, and to check on the status of his scheduled follow up appointment. Each time the nurses, medical staff and medical technicians on duty simply informed the Plaintiff that his follow up appointments had been rescheduled and ignored his repeated requests for a low bunk permit. This pattern of events specifically occurred with Nurse Amy Rue on January 11, 2018 and Nurse Lidia Lewandowska on February 23, 2018.

36. Finally, on March 6, 2018, the Plaintiff was seen by Nurse Amy Rue and Dr. Aguinaldo for a follow up appointment regarding the x-rays taken approximately two months prior. At this appointment, the Plaintiff once again reiterated the constant and extreme pain he

5

felt in his left shoulder and the exasperating effects on his left shoulder from having to climb to the top bunk and interfering with his ability to sleep. The Plaintiff pleaded with Dr. Aguinaldo for a low bunk permit but Dr. Aguinaldo informed Plaintiff that only the medical director, Dr. Okezie could issue a low bunk permit. Dr. Aguinaldo refused to look further into the matter and scheduled a follow up appointment for the Plaintiff with Dr. Okezie.

37. After waiting for another three weeks, the Plaintiff visited the nurse's station to inquire about the follow up appointment with Dr. Okezie and his need for a low bunk permit. Again the nurses, medical staff and medical technicians, including Nurse Michelle Dalton, merely reassured the Plaintiff that his appointment was scheduled for a future date and ignored his low bunk permit request.

38. As a result, Plaintiff laid for many weeks on the floor of his cell overnight as the injury to his left shoulder prevented him from pulling himself up to his assigned top bunk. This continued until on or around March 31, 2018, when Sergeant Kenyon Bailey, the cellhouse sergeant at Stateville, ordered Plaintiff to stop laying on the floor overnight even though he knew of the Plaintiff's injury and the severe pain he was experiencing. This forced the Plaintiff to further aggravate the injury to his left shoulder and further interfere with his ability to sleep. Upon information and belief, Sergeant Bailey was also aware of the Plaintiff's repeated requests for a low bunk permit due to the extreme difficulty and aggravation to his injury climbing into and out of his top bunk.

39. Four weeks later, on or around April 6, 2018, the Plaintiff had a follow up appointment, but it was not with Dr. Okezie. Instead, Plaintiff saw Physician Assistant, La Tonya Williams and Nurse Alethea Harper, to whom he again stressed the severe pain in his left shoulder, his lack of mobility, and the difficulty he had climbing up to the top bunk interfering

6

with this ability to sleep and causing him more pain and irritation. Once again, the Plaintiff was not given a low bunk permit.

40. Finally, on April 19, 2018, almost four months after the injury to his left shoulder, Plaintiff was seen by Dr. Okezie, Nurse Kara Matakiewicz, and Nurse Virginia Garcia. During this visit, Dr. Okezie examined the Plaintiff and informed him that he may have a torn rotator cuff and that his injury was significant. As a result, Dr. Okezie ordered, among other things, a new chest x-ray, a referral for a magnetic resonance imaging ("MRI"), Robaxin, Tramadol, and he told Plaintiff he would grant him a low bunk permit.

41. The next day on April 20, 2018, the Plaintiff saw Nurse Kara Matakiewicz and asked if the low bunk permit was filled out by Dr. Okezie the previous day. Nurse Kara Matakiewicz did not check on the low bunk permit status but rather assured the Plaintiff that it was filled out and he should receive it in 10-14 days.

42. Following this visit with Dr. Okezie, Plaintiff received his medication as ordered, but he did not receive the low bunk permit. Every day the Plaintiff asked the multiple nurses who delivered his medication both in the morning and evening why he hadn't received his low bunk permit that Dr. Okezie ordered. The nurses, including upon information and belief Nurse Amy Rue, Nurse Krista Carnahan, Nurse Gerald Dimailig, Nurse Tina Tomaras, Nurse Dawn Cetta, Nurse Dina Page, Nurse Christine Witowski, Nurse Jerri Angeloff, Nurse Emmanuel Egbe, and Nurse Jennifer Henning, and other medical staff or medical technicians, merely responded that it normally takes ten to fourteen days to receive a low bunk permit and refused to check on the status for him.

43. The Plaintiff grew very concerned that he would not get his low bunk permit and since the pain was still severe and he continued to have difficulty on a daily basis climbing to the

top bunk, Plaintiff visited the nurse's station on or around May 2, 2018. He again inquired about the status of his low bunk permit that Dr. Okezie ordered, but the nurses, including Nurse Lidia Lewandowska, did not check on the status of the permit but instead simply informed him that he would receive it in the mail.

44. After that, Plaintiff continued to make multiple visits to the nurse's station at the health care unit asking about his low bunk permit but was never provided any assistance on checking the status of that permit by the multiple nurses, medical staff or medical technicians on duty.

45. Also during this time, Plaintiff wrote three letters to Dr. Okezie informing Dr. Okezie that he was experiencing severe pain in his left shoulder and due to that pain he was having extreme difficulty moving his arm and climbing in and out of his top bunk. He repeatedly requested for the low bunk permit Dr. Okezie had told him he would grant him. Upon information and belief, Dr. Okezie never responded to the Plaintiff's letters.

46. Eventually, on or around May 25, 2018, the pain was so severe that while attempting to climb to his assigned top bunk, the strength and mobility in Plaintiff's arm gave out entirely. As a result, Plaintiff fell to the concrete floor of his cell injuring his hip, back, knee and ankle. Plaintiff was taken to the health care unit in a wheelchair and was examined by Nurse Jerri Angeloff Nurse Tina Tomaras who issued him an ice permit, crutches, and Ibuprofen but did not issue him a low bunk permit even though Nurse Tina Tomaras saw Dr. Okezie's notes regarding a low bunk permit and Plaintiff informed her that Dr. Okzekie had ordered one. Nurse Tina Tomaras told him to sleep on the floor in the meantime. Plaintiff was scheduled for a follow up to be seen by a physician and sent back to his cell.

47. Due to the extensive injuries and pain the Plaintiff was in, he slept on the floor of his cell for three days before being seen at his follow up appointment by Physician Assistant LaTonya Williams and Nurse Alethea Harper. At this appointment on or around May 29, 2018, the Plaintiff was given three shots for his pain in his lower back and prescribed Tramadol. X-rays were also ordered for his lower back and hip, and his request for a low bunk permit was submitted to Dr. Okezie.

48. The Plaintiff suffered additional serious medical injuries as a result of the fall due to not having a low bunk permit. On information and belief, tests showed that the Plaintiff suffered from a herniated disk between his L4 and L5 vertebra.

49. On or around May 30, 2018, the Plaintiff finally received his low bunk permit. However, it wasn't until on or around June 1, 2018 that the Plaintiff was moved to a different cell so that he could actually use his low bunk permit and sleep on a low bunk.

50. On or around June 14, 2018, Dr. Okezie examined Plaintiff at a follow up appointment. Dr. Okezie issued Plaintiff a low bunk permit, a double mattress order, and a low gallery permit for a six-month period.

51. On August 21, 2018, the MRI was completed and showed significant shoulder injuries.

52. Since August of 2018, Plaintiff has had countless follow up visits with either, Dr. Okezie, Dr. Aguinaldo, Physician Assistant Williams, other doctors on duty at IDOC, as well as eventually being transported to the University of Illinois Chicago Hospital for an additional MRI and orthopedic evaluations.

53. In addition, over the course of the last two years, the Plaintiff has continued to experience ongoing severe pain from the serious injury to his left arm, shoulder and back. As a

result, Plaintiff has been given minimal medications for pain management, steroid shots in his back, and physical therapy treatments for his left arm and shoulder.

54. The Plaintiff's pain from his injury continues to this present day. As recently as September 2, 2020, the Plaintiff was transported to the University of Illinois Chicago Hospital for another steroid shot in his back as treatment for the disc injuries related to his fall from May 25, 2018.

55. Despite Plaintiff's obvious and evident need for a low bunk permit and Plaintiff's multiple requests for this low bunk permit over the course of five months in 2018, the nurses, physician assistants, Dr. Okezie and Dr. Aguinaldo took no steps to provide Plaintiff with a low bunk permit, nor did they take reasonable action to treat the Plaintiff's left shoulder injury.

56. By not granting Plaintiff a low bunk permit, this caused Plaintiff to climb nightly up to his assigned top bunk which further aggravated his already serious medical injury and exposed him to a daily substantial risk of falling.

57. Ultimately, the Plaintiff was significantly harmed by this risk when he fell as he was climbing to his assigned top bunk.

58. Not only did this lack of accommodation to the Plaintiff cause the Plaintiff to fall and sustain more injuries, but it also deprived of him of his right to sleep on his assigned bed as his only other choice was to sleep on the concrete floor.

59. During the Plaintiff's confinement at Stateville, he filed several grievances and exhausted the administrative remedies available prior to filing this action.

## COUNT I – 42 U.S.C. § 1983 (all individual defendants)

60. Count I is directed solely to the individual defendants.

61. Plaintiff realleges Paragraph 1 to 59 of the First Amended Complaint as fully set forth in Count I.

62. Plaintiff suffered a serious shoulder injury during December 2017. This shoulder injury was an objectively serious medical condition.

63. Following his injury, Plaintiff required a low-bunk permit; without a low-bunk permit, Plaintiff faced a substantial risk of harm due to his existing shoulder injury.

64. Each of the individual Defendants knew of Plaintiff's objectively serious medical condition, his need for a low-bunk permit, and the harm that would result if he was not granted his request for a low-bunk permit.

65. Each of the individual Defendants were deliberately indifferent towards the Plaintiff's serious medical needs by failing to provide medical treatment, including failing to provide him with a low-bunk permit.

66. Plaintiff sustained serious injuries and damages as a result of the individual Defendants' conduct and being improperly denied a low-bunk permit including (a) sleeping on the floor of his cell to avoid climbing into a top bunk; (b) ongoing pain related to climbing into and out of a top bunk and eventually falling; and (c) injuring himself while attempting to climb into a top bunk.

Wherefore, Plaintiff respectfully prays the Court: (a) enter judgment in his favor on Count I (b) award him damages in an amount to be determined; (c) award him punitive damages; (d) award him all recoverable costs and fees, including his reasonable attorney's fees; and (e) award him such further relief as the Court deems equitable and appropriate.

**COUNT II -ADA (Wexford)**

67. Count II is directed solely to Wexford.

68. Plaintiff realleges Paragraph 1 to 59 of the First Amended Complaint as fully set forth in Count II.

69. Plaintiff became a disabled individual in or about December 2017 because his shoulder injury prevented him from engaging in one or more major life activities including, but not limited to, lifting his arm, using his arm fully for everyday activities, sleeping, and using his arm to climb into and out of the top of a bunk bed such as those assigned to prisoners at Stateville.

70. Plaintiff is a qualified individual with a disability as defined by the ADA.

71. On information and belief, pursuant to its contract with IDOC, Wexford provides all or nearly all of the medical care to prisoners incarcerated at Stateville, including Eby.

72. On information and belief, Wexford employs most or all of the medical professionals who treated Eby for the conditions that are the subject of this lawsuit.

73. On information and belief, Eby did not have any medical treatment available to him during the time alleged in this lawsuit except the treatment provided to him by Wexford.

74. While confined at Stateville and being treated by Wexford and its employees, Plaintiff made repeated requests to be approved for a low-bunk permit.

75. Plaintiff's need for a low-bunk permit was open and obvious to Wexford.

76. Wexford intentionally, or with deliberate indifference, discriminated against Plaintiff on the basis of his disability by denying him a low-bunk permit.

77. Plaintiff sustained serious injuries and damages as a result of Wexford's discrimination including (a) sleeping on the floor of his cell to avoid climbing into a top bunk; (b) ongoing pain related to climbing into and out of a top bunk and eventually falling; and (c) injuring himself while attempting to climb into a top bunk.

Wherefore, Plaintiff respectfully prays the Court: (a) enter judgment in his favor on Count II (b) award him damages in an amount to be determined; (c) award him punitive damages; (d) award him all recoverable costs and fees, including his reasonable attorney's fees; and (e) award him such further relief as the Court deems equitable and appropriate.

### COUNT III -Rehabilitation Act (Wexford)

78. Count III is directed solely at Wexford.

79. Plaintiff realleges Paragraph 1 to 59 and 67 to 77 of the First Amended Complaint as fully set forth in Count III.

80. Plaintiff became a disabled individual in or about December 2017 because his shoulder injury prevented him from engaging in one or more major life activities including, but not limited to, lifting his arm, using his arm fully for everyday activities, sleeping, and using his arm to climb into and out of the top of a bunk bed such as those assigned to prisoners at Stateville.

81. Plaintiff is a qualified individual with a disability as defined by the Rehabilitation Act.

82. While confined at Stateville and being treated by Wexford and its employees, Plaintiff made repeated requests to be approved for a low-bunk permit.

83. Plaintiff's need for a low-bunk permit was open and obvious to Wexford.

84. Wexford intentionally, or with deliberate indifference, discriminated against Plaintiff on the basis of his disability by denying him a low-bunk permit.

85. Wexford denied Plaintiff access to a low-bunk permit.

86. Plaintiff sustained serious injuries and damages as a result of Wexford's discrimination including (a) sleeping on the floor of his cell to avoid climbing into a top bunk;

(b) ongoing pain related to climbing into and out of a top bunk and eventually falling; and (c) injuring himself while attempting to climb into a top bunk.

Wherefore, Plaintiff respectfully prays the Court: (a) enter judgment in his favor on Count III (b) award him damages in an amount to be determined; (c) award him punitive damages; (d) award him all recoverable costs and fees, including his reasonable attorney's fees; and (e) award him such further relief as the Court deems equitable and appropriate.

## **COUNT IV – ADA (IDOC)**

87. Count IV is directed solely to IDOC.

88. Plaintiff realleges Paragraph 1 to 59 of the First Amended Complaint as fully set forth in Count IV.

89. Plaintiff became a disabled individual in or about December 2017 because his shoulder injury prevented him from engaging in one or more major life activities including, but not limited to, lifting his arm, using his arm fully for everyday activities, sleeping, and using his arm to climb into and out of the top of a bunk bed such as those assigned to prisoners at Stateville.

90. Plaintiff is a qualified individual with a disability as defined by the ADA.

91. While confined at Stateville, Plaintiff made repeated requests to be approved for a low-bunk permit.

92. Plaintiff's need for a low-bunk permit was open and obvious to IDOC.

93. Even after Wexford's employees approved Plaintiff's requests for a low-bunk permit, IDOC refused to provide one to Plaintiff.

94. IDOC intentionally, or with deliberate indifference, discriminated against Plaintiff on the basis of his disability by denying him a low-bunk permit.

95. Plaintiff sustained serious injuries and damages as a result of IDOC discrimination including (a) sleeping on the floor of his cell to avoid climbing into a top bunk; (b) ongoing pain related to climbing into and out of a top bunk and eventually falling; and (c) injuring himself while attempting to climb into a top bunk.

Wherefore, Plaintiff respectfully prays the Court: (a) enter judgment in his favor on Count V (b) award him damages in an amount to be determined; (c) award him punitive damages; (d) award him all recoverable costs and fees, including his reasonable attorney's fees; and (e) award him such further relief as the Court deems equitable and appropriate.

## COUNT V – REHABILITATION ACT (IDOC)

96. Count V is directed solely to IDOC.

97. Plaintiff realleges Paragraph 1 to 59 and 87 to 95 of the First Amended Complaint as fully set forth in Count V.

98. Plaintiff became a disabled individual in or about December 2017 because his shoulder injury prevented him from engaging in one or more major life activities including, but not limited to, lifting his arm, using his arm fully for everyday activities, sleeping, and using his arm to climb into and out of the top of a bunk bed such as those assigned to prisoners at Stateville.

99. Plaintiff is a qualified individual with a disability as defined by the Rehabilitation Act.

100. While confined at Stateville, Plaintiff made repeated requests to be approved for a low-bunk permit.

101. Plaintiff's need for a low-bunk permit was open and obvious to IDOC.

102. Even after Wexford's employees approved Plaintiff's requests for a low-bunk permit, IDOC refused to provide one to Plaintiff.

103. IDOC intentionally, or with deliberate indifference, discriminated against Plaintiff on the basis of his disability by denying him a low-bunk permit.

104. Plaintiff sustained serious injuries and damages as a result of IDOC discrimination including (a) sleeping on the floor of his cell to avoid climbing into a top bunk; (b) ongoing pain related to climbing into and out of a top bunk and eventually falling; and (c) injuring himself while attempting to climb into a top bunk.

Wherefore, Plaintiff respectfully prays the Court: (a) enter judgment in his favor on Count V (b) award him damages in an amount to be determined; (c) award him punitive damages; (d) award him all recoverable costs and fees, including his reasonable attorney's fees; and (e) award him such further relief as the Court deems equitable and appropriate.

September 18, 2020                                  Respectfully submitted,


                                                    /s/ Michael S. Shapiro
                                                    Attorney for the Plaintiff Scott Eby

Michael S. Shapiro
Elizabeth Gomez
Tomlinson & Shapiro, P.C.
8501 W Higgins Rd, Ste. 420
Chicago, IL 60631
312-715-8770
mss@tomlinsonshapiro.com
ehg@tomlinsonshapiro.com

## **CERTIFICATE OF SERVICE**

      The undersigned attorney hereby affirms and states that he served this **Plaintiff's Second Amended Complaint**, on all counsel of record by causing copies of the same to be sent *via* the Court's Electronic Case Filing System on September 18, 2020.

                                             /s/ Michael S. Shapiro